**In re ROXY ROLLER RINK JOINT VENTURE, Debtor.**

**Bankruptcy No. 84 B 11469 PBA.**

United States Bankruptcy Court, S.D. New York.

May 11, 1987.

---

Grutman, Miller, Greenspoon & Hendler, by Stanley B. Hendler, New York City, for Michael Butler.

Gregory Messer, Brooklyn, N.Y., Trustee.

Baron & Gleich, by Stephen B. Gleich, Great Neck, N.Y., for Twins Roller Corp.

Sheber, Pomerantz, Slotnik & Hamburg, by Sol V. Slotnik, New York City, for debtor in possession.

## MEMORANDUM DECISION ON APPLICATION OF MICHAEL BUTLER FOR NUNC PRO TUNC BORROWING ORDER AND OTHER RELIEF

PRUDENCE B. ABRAM, Bankruptcy Judge.

By application dated July .10, 1986, Michael Butler ("Butler") has sought to have this court sign orders authorizing the debtor, Roxy Roller Rink Joint Venture ("Roxy"), to borrow up TO $120,000 from Butler *nunc pro tunc* as of January 2, 1985 and directing Gregory Messer, the Chapter 7 Trustee for Roxy, to pay $139,-520 to Butler, that being the principal sum of $120,000 advanced by Butler plus interest at 12%. Butler's application, which was necessitated by the error, inattention or inadvertence of counsel, must be denied.

This case was commenced on October 17, 1984 when Butler caused Roxy Roller Corp. ("Roller") to file a Chapter 11 petition for or against Roxy. The original petition was a novel creature which appeared at once to be an involuntary and a voluntary petition. Not recognizing such a petition as a legal possibility, the court called upon petitioner's counsel to amend the petition into a more customary form. Thus, on October 30, 1984, an amended petition was filed that was unequivocally an involuntary Chapter 11 petition.

Roxy is a joint venture, whose two partners are Roller, a corporation owned by Butler, and Twins Roller Corp. ("Twins"), a corporation owned by Stephen J. Haenel ("Haenel") and possibly others. A few months before the petition was filed Butler had ousted Haenel as the manager of Roxy, which operated a roller skating rink and disco at 515 West 18th Street in New York City, as a result of disputes over Haenel's management of Roxy's business. Twins filed an answer opposing the involuntary petition, raising among other issues whether an involuntary petition could be filed against a joint venture by one of the venturers.

Shortly after the involuntary petition was filed, Roxy's liability insurance was purportedly terminated. The Debtor maintained that the insurance had been terminated in violation of the automatic stay. The Debtor's landlord, Cotard Realty Associates ("Landlord"), sought to have the automatic stay vacated by motion dated November 21, 1984 for nonpayment of rent post-petition, in addition to pre-petition arrears, and for failure to maintain liability insurance of at least $20 million as required by the lease. The Debtor cured the post-filing arrears, except for real estate taxes as to which a dispute as to the time of payment existed. The court precluded Roxy from operating without liability insurance. By late December, 1984, no order for relief had yet been entered and Roxy was experiencing severe business problems. The Landlord was demanding payment of real estate taxes, no income was being generated since the business was closed due to lack of insurance, the Debtor's ability to reinstate the insurance policy was in doubt and a substantial payment was required to maintain insurance coverage.

This court signed an order to show cause on December 28, 1984, fixing a hearing on January 2, 1985 on the request to authorize Roxy to borrow up to $120,000 from Butler under Bankruptcy Code § 364(c) and to grant Butler secured creditor status with

priority over (1) any and all administrative expenses of the kind specified in Code §§ 503(b) and 507(b); (2) all secured and unsecured creditors of Roxy; (3) a lien and such other additional security in the lease dated as of September 18, 1979 between Landlord and Roxy; and (4) granting Butler such other rights in Roxy's estate as the court might determine at the hearing. Pending the hearing, the court granted interim relief as follows:

"ORDERED, that pending the hearing and determination of this motion Roxy is authorized to incur $15,000 as secured credit and debt from Butler and that Butler is permitted to lend this sum of $15,000 under Section 364(c) which loan will be afforded an administrative priority under Section 503(b) and 507(b) of the Code and will be secured by the aforesaid lease, said $15,000 to be used only for the purposes set forth in the accompanying affidavit on the grounds that said funds constitute emergency expenses which must be paid in order for Roxy to remain in a position to reopen pending the hearing and determination of the instant order to show case."

The hearing on the borrowing application was held as scheduled on January 2, 1985. The problems with the insurance and Landlord were the principal subjects of the lengthy hearing held that day. As to the borrowing application, counsel for Roxy represented that he had spoken to counsel for Haenel[1] and that Haenel's counsel had stated that he would not be present at the hearing. The court then inquired whether Haenel's counsel had any objection or just said he would not be present. Roxy's counsel responded:

"He said he had no objection and if the Court is inclined to grant a lien or any kind of security position, so be it, fine with him." Transcript, 1/2/85 at 3.

No written oral objections were made to the borrowing application. The court stated that it had no problem with the application and was prepared to grant it. The following colloquy then occurred:

"THE COURT: Do you have a proposed Order with you or do you wish to submit one?

"MR. SLOTNICK: I would like to prepare one to reflect certain conditions that I have thought about since I submitted the Order to Show Cause to you.

"THE COURT: Okay.

"MR. SLOTNICK: I can probably have that down to the court tomorrow." Transcript 1/2/85 at 116–117.

The motion papers themselves were endorsed by the court under date of January 2, 1985 "Motion granted. Submit order." However, no order was ever submitted by counsel relative to the borrowing. Counsel did prepare and submit an order reflecting the relief granted at the January 2 hearing relative to the insurance which order was signed on January 8, 1985.

Under date of May 3, 1985, this court issued its decision, reported at 67 B.R. 474, finding that a joint venture was a form of partnership and thus an involuntary petition could be filed against it by one of the venturers. A further decision was issued on June 4, 1985, reported at 67 B.R. 478, following Twin's withdrawal of its denial of the involuntary petition's generally not paying allegation, in which the court declined to stay the entry of the order for relief but did impose certain conditions. Twins appealed the order for relief. By decision dated October 9, 1986, 67 B.R. 479, the District Court affirmed the order. See 67 B.R. 479.

Shortly after the entry of the order for relief in June, the Landlord sought to compel the Debtor to assume or reject the lease. The Debtor opposed the Landlord's motion on the grounds that the Debtor was negotiating for the sale of its assets, including the lease, with two different parties. Within the sixty-day assumption period provided by Code § 365(d)(4), the Debtor's counsel submitted an order to show cause why the 60–day period should not be extended. However, the proposed order to show cause, which was never signed, did not contain any provision extending the

1. The same attorney represented Twins and Haenel.

60–day period provided in Code § 365(d)(4) pending a hearing on the application.

Following several hearings in August and September 1985 at which the Landlord sought an order directing the Debtor to vacate the premises on the grounds that the lease had automatically terminated and the Debtor sought approval of the sale of its assets, including the lease, to a third party, a compromise and settlement was approved by order dated September 12, 1985. The Debtor then closed its sale with the consent and approval of the Landlord. Twins' appeal from the order was dismissed as untimely. See *Twins Roller Corp. v. Roxy Roller Rink Joint Venture,* 70 B.R. 308 (S.D.N.Y.1987).

At that point the Chapter 11 Debtor was no longer operating but did have a substantial sum of money. By application dated August 27, 1985 the U.S. Trustee had sought to have the case converted or dismissed for failure to file monthly operating statements, failure to have adequate insurance and lack of diligence in the prosecution of the case. The Debtor opposed, urging that it would distribute the funds on hand and dismiss the case. When counsel for the Debtor was unable to prepare adequate papers to accomplish this after repeated opportunities, the court converted the case to Chapter 7 by order dated April 14, 1986. The sum of $298,441.25 was thereafter turned over to the Trustee, Gregory Messer.

It is against this background that Butler asks this court to enter a *nunc pro tunc* order authorizing the borrowing as a predicate to entering an order directing the Trustee to make payment to Butler from the funds on hand. Apparently, Butler in fact advanced $120,000 to Roxy. There is nothing in the record that reflects when or how these advances were made. Nor is there any indication that Roxy ever signed any notes to evidence its borrowings or executed any documents to accomplish the granting of a interest in the lease to Butler.

Both the Trustee and Twins oppose Butler's request. Twins argues that the failure to have a separate judgment is a fatal defect, that issuance of a *nunc pro tunc* order would be severely prejudicial to Twins and that Code § 364 does not give the bankruptcy court the power to enter a borrowing order before the order for relief is entered and thus the bankruptcy court had no authority to grant the application in the first place. The Trustee urges that creditors would have been better off if the case had been converted or dismissed and the Debtor had not obtained the infusion of funds. In addition the Trustee argues that the failure to submit an order was more than a ministerial error as the attorney indicated he wanted to include certain provisions not specified in the application and no interest rate had been agreed upon.

The standards for issuance of a *nunc pro tunc* order approving a borrowing were set forth by the Second Circuit in *In re American Cooler Co.,* 125 F.2d 496 (2d Cir.1942):

"We think that the judge should not retroactively validate the loan unless he is confident that he would have authorized it if a timely application had been made, and unless in addition, he is reasonably persuaded that the creditors have not been harmed by a continuation of the business made possible by the loan. He should also take into account, as bearing on the good faith of the debtor and lender, whether or not they honestly believed that they had authority to enter into the transaction. Of necessity, each case must stand on its own facts, and these criteria cannot be mechanically applied; they should, however, materially facilitate the preparation of an intelligent record. We should emphasize that this equitable power must be cautiously exercised, and that only a foolhardy lender would attempt to make it serve as a substitute for proper authorization." 125 F.2d at 497.

Accord, *Wolf v. Nazareth Fair Grounds & Farmers' Market, Inc.,* 280 F.2d 891 (2d Cir.1960) (Objection by minority shareholders to *nunc pro tunc* order overruled as loan proceeds used solely for purposes previously approved by the court, the use of proceeds was instrumental in enabling the

debtor to continue as a going concern and it was uncontradicted that the debtor's creditor had benefitted by the continuation.) Here the Debtor made a timely application for approval of the Butler borrowing which this court granted and the court entered an order as to $15,000 of the borrowing. There has been no showing that the Debtor and Butler did not honestly believe that there was authority to enter into the transaction.

■ Given that a timely application was made and granted, this court does not view whether creditors have been harmed by the continuation of the business to be a relevant consideration. Creditors and Twins were given notice of the hearing on the borrowing application. No objection was raised at that hearing that the business should not be continued. Nor was a motion to limit the Debtor's operations as permitted by Bankruptcy Code § 303(f) made then or later.

■ No *nunc pro tunc* order can, however, overcome the total absence of loan documentation present in this case. An order merely authorizes a debtor to enter into a transaction. It does not eliminate the need for appropriate agreements, including security agreements, between the debtor and the lender. See generally, 2 Collier on Bankruptcy (15th Ed.1986), 364–11[1]. The absence of documents effecting a security interest in the Debtor's lease in favor of Butler is fatal to his claim for treatment as a secured creditor.

■ Since Butler's loan cannot be treated as secured, the issue then becomes whether this court should issue a *nunc pro tunc* order granting Butler priority over administration claims as requested in the borrowing application. Since a priority could be granted only by court order it would usually be unaffected by the absence of loan documentation. For the reasons which follow, this court concludes that Code § 364(c) under which the Debtor applied is not available to a debtor during the involuntary gap period and thus that this court should not issue a *nunc pro tunc* order. Compare, *In re J.L. Graphics, Inc.*, 62 B.R. 750 (Bankr.D.N.H.1986).

An involuntary case is commenced by the filing of the petition. See Code § 303(b). Code § 303(f) provides that after an involuntary case is commenced:

"Notwithstanding section 363 of this title, except to the extent that the court orders otherwise, and until an order for relief in this case, any business of the debtor may continue to operate, and the debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced."

Code § 303(f) does not state that the debtor's operations are limited to the ordinary course of business although certain other provisions of the Code may as a practical matter constrain the involuntary gap debtor's operations. Code § 502(f) provides for the allowance of claims arising in "the ordinary course of the debtor's business or financial affairs." These claims are entitled to a second priority behind administrative expenses but prior to wage claims under Code § 507(a)(2). See 3 Collier on Bankruptcy (15th Ed.1986) at 507.04[2]. Code § 549(a) permits the trustee to recover transfers that occur after the commencement of the case and that are either (1) authorized only under Code § 303(f) or (2) not authorized under the Code or by the court. Code § 549(b) provides that in an involuntary case

"a transfer made after the commencement of such case but before the order for relief to the extent of any value, including services, but not including satisfaction or securing of a debt that arose before the commencement of the case, is given after the commencement of the case in exchange for such transfer, notwithstanding any notice or knowledge of the case that the transferee has."

This section protects persons who receive transfers of property of the estate during the involuntary gap period to the extent that post-petition value is given. See 4 Collier on Bankruptcy (15th Ed.1986) at 549.03[1] and [2]. Thus, the grant of a security interest in the lease by the Debtor to Butler in exchange for a loan would not

have been a voidable transfer even if no court order was obtained.[2]

It is against this statutory scheme that the availability of Code § 364 during the involuntary gap period must be analyzed. Code § 364(a),[3] which permits debt to be incurred by a trustee without prior court order, states:

"If the trustee is authorized to operate the business for the debtor under section 721, 1108, or 1304 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense."

This section cannot be operative during the involuntary gap period because the debtor's authorization to operate the business comes from Code § 303(f) and not from Code §§ 721 or 1108. Moreover, for the reasons detailed below, the term trustee does not include the involuntary gap debtor. Finally, the priority fixed is in direct conflict with that provided by Code § 507(a)(2). See also 2 Collier on Bankruptcy (15th Ed.1986) 364.02 at 354-7 (Reaches same conclusion but on different grounds).

Code § 364(b) provides that the court may after notice and a hearing authorize the trustee to obtain unsecured credit or incur unsecured debt other than under Code § 364(a), i.e., out of the ordinary course of business, as an administrative expense allowable under Code § 503(b)(1). If the trustee is unable to obtain unsecured credit allowable under Code § 503(b)(1) as an administrative expense, Code § 364(c) permits the court after notice and a hearing to authorize the obtaining of credit or the incurring of debt with priority over any or all administrative expenses of the kind specified in Code § 503(b) or § 507(b); or secured by a lien on estate property not otherwise subject to lien; or secured by a

junior lien on property of the estate that is subject to a lien.[4]

A leading treatise states that

"In a involuntary case credit incurred outside the ordinary course of business before entry of the order for relief must be authorized by the court under section 364(b). Such credit is entitled to priority as an expense of administration under section 503(b)(1). Section 502(f) applies only to credit obtained in the ordinary course of business during the so-called involuntary gap period, and therefore will not disqualify credit authorized under section 364(b) from priority under sections 503(b)(1) and 507(a)(1)." 2 Collier on Bankruptcy (15th Ed.1986), 364.04 at 364-9.

This analysis appears flawed. No support can be found in Code § 502(f) for the limitation drawn. Nor is there a sufficient distinction between Code § 364(a) and (b) to warrant the conclusions stated.

The meaning of the term trustee used throughout Code § 364 is obvious when a trustee, permanent or interim, has been appointed. In a Chapter 11 case, Code § 1101(1) provides:

" 'debtor in possession' means debtor except when a person that has qualified under section 322 of this title is serving as trustee in the case"

In Code § 101(12), the term debtor is defined as "person or municipality concerning which a case under this title has been commenced." Code § 1107(a) states that:

"subject to any limitations on a trustee serving in a case under this chapter, and to such limitation or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except

---

**2.** It appears that additional protection would be afforded by a court order. See Code § 549(a)(2)(B).

**3.** Code § 303(a) provides that Chapters 1, 3, which includes Code §§ 364, and 365 apply in Chapter 11 cases.

**4.** Code § 364(d)(1), which is not relevant in this case, permits the court to authorize the trustee

to obtain credit or incur debt secured by a senior or equal lien on property of the estate that is subject to lien only if the trustee is unable to obtain such credit otherwise and there is adequate protection for the holder of the lien on the property on which the senior or equal lien is granted.

the duties specified in sections 1106(a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter." Only if Code § 1107(a) applies to the debtor during the involuntary gap period would the debtor fall within the definition of the term "trustee" and be able to use Code §§ 364(b) and (c) to incur superpriority borrowings.

The statutory scheme makes it evident that Code § 1107(a) does not apply to the debtor during the involuntary gap period. Code § 303(f) allows the involuntary gap debtor to operate as if no petition had been filed, unless otherwise ordered by the court. The freedom explicitly granted by Code § 303(f) to the debtor is plainly inconsistent with the fiduciary obligations imposed on a debtor by Code § 1107(a). It is unreasonable to assume that the Code intended to impose such fiduciary obligations on the unwilling involuntary debtor before the order for relief. As the involuntary gap Chapter 11 debtor cannot qualify as a "trustee", it cannot take advantage of Code § 364(b) or (c) to obtain superpriority for the claims of a lender. It is a sensible statutory scheme to preclude the debtor from taking advantage of the powers of the Bankruptcy Code, such as the right to incur debt under Code § 364 on a priming lien, superpriority basis or the right to void liens, recover fraudulent conveyances or set aside preferences under Code §§ 547 and 548, while the debtor opposes the entry for an order for relief and when no order for relief may ever be entered.

It is only the involuntary petition filed by a partner (or the occasional corporate case commenced by a shareholder who also is a creditor) that presents the possibility that the existing management of the debtor is not opposed to entry of an order for relief but is unable to consent to entry of the order for relief. The sympathy appeal of management's plight in such a case is more superficial than real. Various means are provided under state law for dealing with a management impasse. In addition, secured borrowings could be made.[5]

■ This court did enter an order granting a superpriority under Code § 364(c) for Butler to the extent of $15,000. At the time the order was entered, the court was of the view that such an order was legally permissible. No contrary authority or analysis was then brought to the court's attention. Twins as well as the other large creditors had actual notice of the order and no appeal was taken.

Code § 364(e) provides:

"The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pending of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal."

Here no appeal was even taken so that the policy of finality for borrowing orders found in Code § 364(e) is even more applicable. See generally *In re EDC Holding Co.*, 676 F.2d 945 (7th Cir.1982).

■ It could be argued that this court should enter the requested *nunc pro tunc* order without regard to its present view of the law because it understood it to be proper at the time it granted the motion. The court believes that it is required to apply the legal principles as it sees them today.

The failure to obtain a timely order is due solely to the fault of counsel who did not have an order at the hearing because he had thought of a few more unspecified conditions he wanted to put in the order. Counsel was apparently representing both Butler, as lender, and Roxy, as borrower. This was a conflict of interest which no doubt contributed to the failure to have proper loan documentation prepared and

---

**5.** It might also be argued that an interim trustee appointed under Code § 303(g) could borrow under Code § 364(b), (c) and (d) as those subsections make no explicit reference to the source of authority to operate.

executed and also caused counsel to fail to prepare and submit an appropriate order. See Canon 5 of the Code of Professional Responsibility, Ethical Considerations (Interests of Multiple Clients) and Disciplinary Rules, DR5–105. See also generally, Nassberg, Loan Documentation: Basic But Crucial, 36 *The Business Lawyer* 843 (April 1981).

The borrowing application contained some unusual requests. For example, the application seeks an order under Code § 364(c) which grants Butler priority status against Twins and Haenel and provides that:

> "Butler not be deemed to have pierced the corporate veil which he established by forming Roxy as a joint venture in the form of two corporate general partners, and that no one be permitted to use the fact of Butler's personal contribution as a basis for seeking to hold Butler personally liable for any of the debts of Roxy as a joint venture * * * " Affidavit at 5–6.

Additional requests in the application dealt with terms relative to Butler's rights to cure lease defaults and to participate in the sale of the lease. These requested conditions appear to be variants on or reformulations of terms such as might be found in standard loan and security agreements.

In the final analysis, this court is being asked to excuse the neglect of counsel. No justifiable reason has been shown for this court to do that. It cannot cure the absence of loan documents so as to create a security interest in the lease where none was granted by the Debtor. Nor can it now grant a priority which on considered reflection it finds unavailable.

Counsel for Butler may submit an order directing the Trustee to pay Butler the sum of $15,000.