In re James E. IMBODY and Peggy A. Imbody, Debtors.

NATIONAL CITY BANK, MARION, Plaintiff,

v.

James E. IMBODY, et al., Defendant.

Bankruptcy No. 86–0104.

Related Bankruptcy No. 84–01857.

United States Bankruptcy Court, N.D. Ohio, W.D.

Feb. 24, 1989.

---

Leon Friedberg, Columbus, Ohio, for plaintiff.

Malcolm L. Goodman, Trustee, Marion, Ohio.

Dean R. Washburn, Marion, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court after Trial on the Complaint to Determine Dischargeability of Debt and Objection to Discharge of National City Bank, Marion. At the Trial, the parties had the opportunity to present the evidence and arguments they wished the Court to consider in reaching its decision. The Court has reviewed the testimony, the documents which were admitted at Trial, and the arguments of counsel, as well as the entire record in this case. Based upon that review, and for the following reasons, the Court finds that Banc-Ohio's Complaint should be granted in part, and denied in part.

### FACTS

Most of the facts in this case do not appear to be in dispute. At some time prior to May 21, 1980, the Plaintiff, Banc-Ohio, which was then known as National City Bank of Marion, started to finance the farming operation of James E. Imbody and Peggy A. Imbody (hereinafter "the Imbodys"). As of May 24, 1983, the Imbodys were indebted to BancOhio in the amount

of One Hundred Twenty-three Thousand Fifty Dollars and Sixty-three Cents ($123,050.63). That amount represented a deficiency balance due after the payment of the proceeds from the Imbodys' 1982 crops. On May 24, 1983, the Imbodys borrowed One Hundred Thirty-five Thousand Dollars ($135,000.00) from BancOhio. The Imbody's were issued two (2) checks, one for Thirty-five Thousand Dollars ($35,000.00), and the second for One Hundred Thousand Dollars ($100,000.00). On the same day, the Imbodys also signed a security agreement which states in pertinent part:

James E. Imbody and Peggy A. Imbody (hereinafter called Debtor), for valuable consideration, receipt whereof is hereby acknowledged, does hereby grant to The National City Bank of Marion, Marion, Ohio, (hereinafter called Secured Party) a security interest in the property described below, together with any additions and accessions thereto; and if farm crops or supplies, the products thereof, grown or growing, or planted on premises indicated below within one year from date hereof; and if farm livestock the young, products, and produce thereof. (Hereinafter called the collateral.)

1. All Crops of every kind heretofore planted and now growing, or hereafter planted, on the real estate described on Schedule A, attached.

2. All inventories of grain or other plant products now owned or hereafter acquired by Debtor, including without limitation grain stored off the farm.

3. All products and proceeds of any of the foregoing, including cash and accounts receivable.

This financing statement is to be filed for record in the real estate records.

NO COLLATERAL COVERED BY THIS FINANCING STATEMENT MAY BE DISPOSED OF BY DEBTOR WITHOUT THE EXPRESS WRITTEN CONSENT OF THE SECURED PARTY.

A financing statement was filed in the office of the Marion County Recorder, perfecting BancOhio's crop lien. Also securing BancOhio's loan was a second mortgage on the Imbodys' real estate. As part of the loan transaction, the Imbodys also immediately tendered a check to BancOhio for One Hundred Twenty-three Thousand Fifty Dollars and Sixty-three Cents ($123,050.63) for the previous deficiency. Essentially, the parties "resecured" the BancOhio loan, and the Imbodys received a new line of credit of approximately Twelve Thousand Dollars ($12,000.00).

At the end of the 1983 crop year, all proceeds were paid to the bank pursuant to BancOhio's security agreement. The amount realized was substantially less than the amount necessary to repay the total balance owed to BancOhio. The Imbodys did repay the new money which had been extended, and it appears they reduced the balance owing from the preceding years by approximately Forty-eight Thousand Dollars ($48,000.00).

In the spring of 1984, the Imbodys made application for additional financing for the 1984 crop year. BancOhio reviewed the Imbodys' general financial condition, and decided not to give the Imbodys a new operating loan. To finance the planting of the 1984 crop, the Imbodys sold their farm machinery, which was generally unencumbered, and used what credit they could obtain from input suppliers. At that time, BancOhio had no security interest in the any of the 1984 crop, with the exception of a small amount of winter wheat which had been planted within one year of the 1983 security agreement.

In the fall of 1984, the Imbodys began harvesting their crops. They were, at this time, delinquent on the first mortgage held by Federal Land Bank. BancOhio offered to loan the Imbodys Thirty-five Thousand Dollars ($35,000.00) so that they could make a payment to Federal Land Bank. However, because of the amount of the delinquency, Federal Land Bank refused to accept a partial payment, and began foreclosure proceedings. An agreement granting the bank a security interest in the 1984 crops was signed by the Imbodys, but they never signed a promissory note because the Thirty-five Thousand Dollars ($35,000.00) was not actually loaned by BancOhio. The security agreement was never dated. The

Imbodys also signed a financing statement, which is dated August 31, 1984. The financing statement was filed with the Marion County Recorder's Office on September 4, 1984.

On November 30, 1984, the Imbodys filed their Chapter 11 Petition with the Bankruptcy Court and became Debtors–In–Possession (hereinafter "D–I–P"). The Imbodys' case was assigned to the Honorable Walter J. Krasniewski, United States Bankruptcy Judge for the Northern District of Ohio, Western Division. On January 29, 1985, Federal Land Bank filed a Motion for Relief from Stay on the D–I–P's real property. Federal Land Bank's first mortgage covered approximately Three Hundred Ninety-three (393) acres of the D–I–P's property. On February 4, 1985, BancOhio filed its Motion for Relief from Stay, alleging a debt of One Hundred Twenty-one Thousand Three Hundred Eighty-nine Dollars and Fifty-five Cents ($121,389.55), plus interest, secured by a second mortgage. Both Motions were set for Hearing on February 28, 1985, and were continued, at the request of D–I–P's counsel, to March 12, 1985. In their Answer and Request for Hearing, the Imbodys' admitted that BancOhio had an interest in the D–I–P's real estate, but apparently disputed the validity of any security interest in the crops.

On March 12, 1985, the parties negotiated a settlement and read it into the Court's record. The Imbodys agreed to deed all their real property to Federal Land Bank in lieu of foreclosure, and then lease it back if they could obtain new financing within fourteen (14) days. BancOhio agreed to consider and respond to the D–I–P's request for an operating loan within the same fourteen (14) day period. The parties agreed that any loan would be on a secured basis. In return, the Imbodys agreed to modification of the Stay, permitting the bank to reclaim and foreclose on the collateral described in two exhibits. The relevant portions of the exhibits are the May 24, 1983 financing statement, and a UCC–1 filed with the Marion County Recorder on May 31, 1983. *See,* March 12, 1985 *Order Modifying Stay.*

On April 2, 1985, a Stipulation and Order was signed by the parties, and by Judge Walter J. Krasniewski. · It appears that the Stipulation and Order was drafted by counsel for Federal Land Bank.

On April 4, 1985, the Imbodys signed a promissory note to BancOhio for Eighty-two Thousand Five Hundred Dollars ($82,-500.00). The Imbodys also signed a security agreement giving BancOhio an input crop lien on the D–I–P's crops. The language is essentially identical to that used in the 1983 security agreement quoted *supra.* No application was made to the Bankruptcy Court pursuant to 11 U.S.C. § 364(b) and (c), for approval of the secured borrowing. BancOhio advanced operating funds to the Imbodys pursuant to the loan agreement in the amount of Eighty-eight Thousand Seven Hundred Sixteen Dollars and Forty Cents ($88,716.40). The monies were paid out in Nine (9) cashiers checks issued between April 4, 1985 and August 7, 1985.

BancOhio perfected its security interest by filing a UCC–1 with the Recorder's Office, and by sending its "Notice of Security Interest in Farm Products" to both Pillsbury and Central Soya, the two known purchasers of the Imbodys' grain. The notice sent by BancOhio, pursuant to O.R.C. § 1309.26(B)(2), instructs the grain purchaser to issue all checks in the names of both the Imbodys and BancOhio. However, because of the bankruptcy filing, Central Soya followed a procedure through which checks were, as a matter of policy, issued in the D–I–P's name only.

BancOhio did not receive any notice of this change in the manner in which the checks would be issued from the grain purchasers, or from the Imbodys when they learned of the change. Moreover, during the time the Imbodys were receiving checks from Central Soya in payment for their grain, the Imbodys stopped filing monthly reports. A review of the D–I–P's report for October of 1985 reflects that the Debtors had received no income from farm products during the month, and made no disbursements. The October balance in the D–I–P account was Three Hundred Four-

teen Dollars and Sixteen Cents ($314.16). The monthly reports for November, December, January and February were all filed on February 27, 1986. The November through January reports indicate that the Debtors received One Hundred and Five Thousand Eight Hundred Forty-eight Dollars and Eighty-one Cents ($105,848.81) from Central Soya. The November, December, and January reports also show that all D–I–P funds were disbursed to various creditors.

BancOhio's Complaint arises from the fact that the Debtor did not apply all of the money from the sale of the 1985 grain toward the satisfaction of BancOhio's priority input crop lien. Instead, the Imbodys paid other creditors, and turned over the remaining balance to BancOhio. Testimony by the Imbodys indicated that they made a conscious decision to pay the I.R.S. instead of BancOhio. On February 10, 1986, the Imbodys case was converted to a proceeding under Chapter 7. May 6, 1986 was fixed as the last day for the filing of objections to the discharge of the Debtors, and for filing complaints to determine dischargeability of debts. BancOhio filed its Complaint to Determine Dischargeability of Debt and Objection to Discharge on May 6, 1986.

The Imbodys main case, and BancOhio's Complaint, were transferred to this Court on April 29, 1987.

## LAW

■ The first issue that must be addressed in this case is the validity of BancOhio's lien. It is not disputed that BancOhio failed to obtain Bankruptcy Court approval of its secured loan to the Imbodys as required under 11 U.S.C. § 364(c), which states in pertinent part:

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

See also, § 1107(a) (D–I–P has rights and duties of a Trustee).

BancOhio argues that this Court should approve the credit transaction between the bank and the Debtors nunc pro tunc. It is BancOhio's position that such "after the fact" approval is within the Court's equitable powers, and may also be done under 11 U.S.C. § 105(a). A review of the case law reflects that nunc pro tunc approval is appropriate "in unusual circumstances". See, Wolf v. Nazareth Fair Grounds & Farmers' Market, Inc., 280 F.2d 891, 892 (2nd Cir.1960); In re American Cooler Co., Inc., 125 F.2d 496, 497 (2nd Cir.1942); In re Gloria Mfg. Corp., 65 B.R. 341, 347 (E.D.Va.1985); In re C.E.N., Inc., 86 B.R. 303, 306 (Bankr.D.Me.1988); In re Roxy Roller Rink Joint Venture, 73 B.R. 521, 524 (Bankr.S.D.N.Y.1987); In re Cascade Oil Co., Inc., 51 B.R. 877, 882 (Bankr.D.Kan.1985); Matter of Alafia Land Development Corp., 40 B.R. 1, 4 (Bankr.M.D.Fla.1984).

In American Cooler, supra, the Court of Appeals suggested guidelines as to when these "unusual circumstances" might be present:

We think that the judge should not retroactively validate the loan unless he is confident that he would have authorized it if timely application had been made, and unless, in addition, he is reasonably persuaded that the creditors have not been harmed by continuation of the business made possible by the loan. He should also take into account, as bearing on the good faith of the debtor and lender, whether or not they honestly believed that they had authority to enter into the transaction.

In re American Cooler Co., Inc., supra 125 F.2d at 497.

This case involves several elements which do not appear to have been dealt with in previous published decisions. One

aspect of this action which makes it somewhat different is the fact that this case was transferred. During the time the Debtors were operating under Chapter 11, the case was assigned to the Honorable Walter J. Krasniewski. Subsequently, the case was transferred to this Court after Judge Krasniewski issued his decision in *In re Derryberry*, 72 B.R. 874 (Bankr.N.D.Ohio 1987). This Court concurred in that judgment, but offered the Debtors the opportunity to secure new counsel. The Imbodys did engage new counsel, and the case continued before this Court. Under these circumstances, an interesting problem arises in applying the *American Cooler* guidelines. The *American Cooler* test requires judges to ask themselves if they would have authorized the loan if an application had been timely made. In the present case, the question is more difficult because it requires reconstruction, rather than just recollection.

Another factor which this Court must weigh is the effect of the Court's limited participation in the settlement process, and the fact that the settlement agreement contemplated a secured loan. A review of the decisions dealing with *nunc pro tunc* loan approval does not reveal any cases in which the Court was apparently aware that the loan would be given, but where the creditor never requested formal approval. In this case, there was significant Court involvement in the settlement which led to the loan transaction herein. There can be no doubt that it is a creditor's responsibility to make sure that any extension of credit is approved by the Bankruptcy Court. However, both the settlement agreement resolving the Motions for relief from stay which was read into the record, and the Stipulation and Order of April 2, 1985, set forth the fact that a loan was being contemplated on an expedited basis. Clearly, from those sources, the Court was aware that the Debtors were going to borrow money to continue operating.

Finally, with the exception of a few paragraphs in *Roxy Roller Rink, supra*, it appears that the reported cases only deal with the *nunc pro tunc* approval of loans under what would now be § 364(b),

§ 364(c)(1) and § 503(b)(1). It should also be noted that while *In re Roxy Roller Joint Venture* cites the *American Cooler* standard, it does not base its decision on the factors set forth in that case. However, all the decisions which address the "subsequent approval" issue under other sections, such as for a superpriority lien, or for administrative expense status, have generally adhered to the standard set forth in *American Cooler*. Consequently, in addressing BancOhio's Motion, the Court will follow the approach used in prior *nunc pro tunc* cases.

Looking at the case *sub judice*, it is significant that the settlement agreement was reached at the March 12, 1985 Hearing, and read into the record at that time. While the agreement was for BancOhio to "consider" the Imbodys' loan application, it appears that it would have been very evident to the Court that the parties were contemplating a secured loan. Notwithstanding the relatively easy credit which has previously been available to farmers, the vast majority of farms which are operating under the protection of the Bankruptcy Court are not going to be able to obtain credit except on a secured basis. Chapter 11 farmers are almost always burdened with far too much debt to obtain an unsecured loan. In the experience of this Court, input crop liens are the most common method of financing the farm operations of a debtor-in-possession.

The Stipulation and Order which was signed by Judge Krasniewski on April 2, 1985, also refers to the loan which was contemplated by the parties. The relevant portion of the Stipulation and Order states:

THE FEDERAL LAND BANK OF LOUISVILLE agrees to cash rent the real property of the debtors in possession to the debtors in possession at $75.00 per tillable acre for the 1985 crop season. Payment of the land rental to be evidenced by loan approval within fourteen (14) days and payment within twenty-one (21) days, or the duty of THE FEDERAL LAND BANK OF LOUISVILLE to so rent the land to the debtors in possession shall terminate.

Under this agreement, the Imbodys and BancOhio had to act quickly or, by the terms of the agreement, Federal Land Bank's obligation to rent the land to the D-I-P's would terminate. Without land to farm, the reorganization effort would be finished.

The first part of the *American Cooler* test states that the Court should not retroactively validate a loan unless it appears that the loan would have been authorized if a timely application had been sought. Mr. Imbody has stated that a secured input crop lien was the only possible source of funds. The loan was the only way the Debtors were going to be able to continue operations. Based upon the previous Court's awareness of the terms of the settlement agreement, and the information in the Petition, it appears that the Court would have authorized the BancOhio loan on a secured basis.

The second part of the *American Cooler* test requires that the other creditors of the Debtor-In-Possession were not harmed by the continuation of the business made possible by the loan. While there is always some risk in the continuation of a business, the approval of the Stipulation and Order is one indication that the Court did not feel the risk was too great, or that the creditors were likely to be harmed. Clearly, the continuation of the business made possible by the loan did not do actual harm to the other creditors. The Imbodys paid the other creditors with BancOhio's proceeds. Thus, in retrospect, there was no harm done to other creditors.

Lastly, the Court must determine if the lender acted in good faith. One factor in that decision is whether or not the creditor honestly believed it had authority to enter into the transaction. The record in this case shows that after the parties entered into the settlement agreement, they proceeded to complete the loan arrangements without any further involvement of their respective attorneys. From the testimony and the evidence presented, it appears both parties believed they had the authority to enter into the loan transaction.

In addition it should be noted that the factors which led the *Roxy Roller Rink* court to reject *nunc pro tunc* approval are not applicable to the present case. In *Roxy Roller Rink*, the court was not satisfied that the borrowing of money from one of the joint venturers ever actually occurred. *In re Roxy Roller Rink Joint Venture, supra,* 73 B.R. at 525. Here, the loan was an arms length transaction which has been extensively documented.

Accordingly, the bank having satisfied the *American Cooler* test, and it being equitable to do so, the Court finds that BancOhio's loan should be allowed as secured.

DISCHARGEABILITY UNDER § 523(a)(6)

BancOhio's Complaint also seeks to have the balance of its loan held nondischargeable under several different sections of the Bankruptcy Code. BancOhio asserts that the debt is nondischargeable under § 523(a)(6), § 523(a)(2)(A), § 523(a)(2)(B), and § 523(a)(4). Section 523(a)(6) states:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an·individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

The terms "willful and malicious" were defined in the recent Sixth Circuit decision *Perkins v. Scharffe,* 817 F.2d 392 (6th Cir. 1987), *cert. denied,* 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 112 (1987). The *Perkins* decision held that "willful" means the deliberate and intentional doing of an act that necessarily leads to injury. *Perkins, supra* 817 F.2d at 394. The Court of Appeals cited the definition of "malicious" found in 3 *Collier on Bankruptcy* ¶ 523.16 at 523–111 (15th ed.1986):

An injury to an entity or property may be a malicious injury within this provision if it was wrongful and without just cause or excessive, even in the absence of personal hatred, spite, or ill-will.

*Perkins,* at 394.

A creditor seeking an exception to a debtor's discharge under § 523(a)(6) must sustain their burden of proof by clear and

convincing evidence. *In re Weitzel*, 72 B.R. 253, 257 (Bankr.N.D.Ohio 1987).

A substantial number of cases have addressed the dischargeability of obligations secured by collateral which has been converted. In these cases, the courts have used various criteria to determine whether there has been a "willful and malicious" injury to a creditor's security interest. Under the *Perkins* standard, it appears that no personal animosity toward the creditor is necessary for the injury to be held "malicious". *In re Gault*, 83 B.R. 468, 469 (Bankr.S.D.Ohio 1988); *see also, In re Cecchini*, 780 F.2d 1440, 1442 (9th Cir.1986). Thus, as was stated in *Perkins*, "a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may constitute a willful and malicious injury." *Perkins*, 817 F.2d at 394.

Other courts have adopted different tests for determining whether a conversion is "malicious". For example, in *In re Beasley*, the court established a three prong inquiry:

> (1) Has the debtor sold secured property?
>
> (2) Has the debtor used the proceeds?
>
> (3) Has the debtor failed to demonstrate that the use was for the benefit of the estate or for some necessary purpose?

*In re Beasley*, 62 B.R. 653, 655 (Bankr.W.D.Mo.1986).

Though standard tests, such as the one set forth in *Beasley*, can be a very useful tool, this Court will review the overall facts and circumstances of the case in making its decision under *Perkins*. While "tests" can provide a focus for the Court's inquiry, under § 523(a)(6), there should be no predetermined criteria for what may constitute "just cause or excuse". *See, In re Gault*, 83 B.R. 468, 469 (Bankr.S.D.Ohio 1988); *In re Sindic*, 44 B.R. 167, 171 (Bankr.E.D.Wis.1984).

■ The third prong of the *Beasley* test does point out an exception that some courts have recognized in cases involving the wrongful disposal of collateral. When the funds generated by the sale of secured property is used to further a good faith attempt at reorganization, some courts hold that the injury is not willful and malicious. *See, In re Long*, 774 F.2d 875 (8th Cir.1985); *In re Beasley, supra*. *But see, In re Emporelli*, 42 B.R. 814 (Bankr.W.D.Pa.1984). Here, even if the exception were recognized, it would be inapplicable. The payment of taxes was not in furtherance of the D–I–P's efforts to reorganize. The Imbodys testified that they had already decided that they would discontinue farming after the 1985 crop year. They were simply trying to satisfy a personal tax obligation which would be nondischargeable under Chapter 7.

In the present case, the Debtors' actions support a finding that their obligation to BancOhio is nondischargeable. It is important to remember that BancOhio had protected itself in two ways. First, the bank sent a "Notice of Security Interest in Farm Products", as is called for in O.R.C. § 1309.26(B)(2). This notice was disregarded by the grain purchaser, and instead of issuing two-party checks, Central Soya made the checks payable to the Imbodys only. However, BancOhio also had a perfected security interest in the crop proceeds. The Imbodys knew of this security interest and they knew what it meant. The Imbodys signed security agreements in 1983, 1984 and 1985 that contained almost identical language, granting a security interest in crop proceeds. The Debtors admitted that they acted deliberately and intentionally in paying the I.R.S. ahead of BancOhio. They also knew that there would be no other monies available to repay the bank. Thus, under *Perkins*, they acted "willfully" for purposes of § 523(a)(6).

The Imbodys conduct was also "malicious" under the *Perkins* definition. The Imbodys testified that they understood how a crop input lien worked and what it meant. Moreover, a debtor's knowledge that a transfer of secured property would harm creditors can be inferred from the debtor's experience in business. *In re Gantt*, 56 B.R. 852, 857 (Bankr.E.D.Va.1985); *In re Adametz*, 53 B.R. 299, 304 (Bankr.W.D.Wis.1985); *In re Donofrio*, 19

B.R. 734, 736 (Bankr.N.D.Ohio 1982). The D–I–P's testified that they had engaged in farming since 1971, and had financed their operation through bank loans many times. It is important to remember that the Imbodys' rationale for not paying BancOhio the crop proceeds was not based upon a belief that their loan was invalid under the bankruptcy laws. Instead, the Imbodys have claimed that they decided not to pay the bank based on a conversation they had with a bank employee during the signing of the loan agreement. As Mrs. Imbody stated in her Deposition:

Q. Okay. And on what basis did you and your husband decide to not pay National City the balance due under its secured loan?

A. Well, when I originally signed these papers in March or April of '85, I knew we would have a tax problem. I sat—before I put my name on the paper, I said, "We're going to have—if we have to sell both these crops, we have sold two crop years, 1984 and 1985, in both years we're going to have a big tax problem" My answer was given to me that, "We'll take care of that or we'll cross that bridge when we get there" is what was said in so many words. I can't—

Q. Who said that?

A. Rayda Jones

Q. Okay. What else was said at that time?

A. Not really anything. Not as far as the taxes. It was just like brushed aside.

November 7, 1986 *Deposition of Peggy A. Imbody* at 61

The Court cannot accept the Imbodys' unlikely contention that they believed there had been an oral modification of the loan agreement. They could not have had a good faith belief that the vague statements of an employee actually modified the terms of the written agreement which they signed unaltered. The Imbodys, through their long experience dealing with banks, could not have understood the statement of Rayda Jones, if it occurred, as being an agreement to allow the Imbodys to pay the I.R.S. with the bank's crop proceeds. Even if the Court were to accept the Imbodys'

explanation, the testimony at Trial reflected that their understanding included an obligation to consult with the bank before paying the I.R.S. ahead of BancOhio. They did not do so. It is particularly unfortunate for the D–I–P's that they did not discuss their tax problems with the bank. At Trial, the bank provided extensive documentation that the Imbodys actually would have paid little or no taxes if they had properly utilized previous losses which had been carried forward on earlier tax returns.

The Imbodys' contention that they acted in good faith in paying the I.R.S. is undercut by the fact that they did not proceed openly and without concealment. Rather, the Imbodys failed to notify BancOhio that they had received checks from Central Soya for the crops. Further, they stopped filing the monthly reports which would have alerted BancOhio that the grain checks had been received. While the Imbodys contend that their previous attorney failed to file the reports, it is the D–I–P's responsibility to make sure that monthly reports are filed timely. Moreover, they have taken no action against Mr. Derryberry for his alleged negligence in holding back the reports until after the conversion of the Imbodys' case to a proceeding under Chapter 7.

In the final analysis, it appears to the Court that the Debtors knowingly violated the terms of BancOhio's security agreement, and that the violation was "willful and malicious" under the bankruptcy meanings of those terms. The Imbodys have never denied that their actions were willful. They acted intentionally in paying the I.R.S. out of the crop proceeds, rather than paying BancOhio. It is also the finding of this Court that they acted "maliciously", as that terms is defined in *Perkins v. Scharffe, supra*. While they may not have had any hatred or ill-will toward the bank, the Debtors acted wrongfully, and without just cause in disposing of the crop proceeds. It appears that holding this debt nondischargeable is supported by case law dealing with similar fact situations. *See, In re Cecchini, supra; Matter of Robison*, 86 B.R. 182 (Bankr.W.D.Mo.1988); *In re*

*Gantt,* 56 B.R. 852 (Bankr.E.D.Va.1985); *In re Adametz,* 53 B.R. 299 (Bankr.W.D. Wis.1985); *In re Boren,* 47 B.R. 293 (Bankr.W.D.Ky.1985); *In re Sindic,* 44 B.R. 167 (Bankr.E.D.Wis.1984); *In re Cardillo,* 39 B.R. 548 (Bankr.D.Mass.1984); *In re Contento,* 37 B.R. 853 (Bankr.S.D.N.Y. 1984; *In re Donofrio,* 19 B.R. 734 (Bankr. N.D.Ohio 1982).

What is particularly disturbing to the Court is that this was done during a Chapter 11, while the creditors were being held at bay. Under 11 U.S.C. § 1107(a), debtors-in-possession are given most of the powers and duties of trustees, and under § 1129 an obligation of good faith is imposed. However, in this case, it appears that those provisions were ignored. The Imbodys decided to pay the tax debt, which they knew to be nondischargeable, present BancOhio with a *fait accompli,* and take their chances with this litigation. As previously stated, this Court will find the debt to be nondischargeable under § 523(a)(6).

DISCHARGEABILITY UNDER § 523(a)(2)(A)

■ The requirements for holding a debt nondischargeable under § 523(a)(2)(A) are as follows:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

In order to demonstrate fraud or a false representation for purposes of Section 523(a)(2), a plaintiff must prove: 1) that the defendant made a representation; 2) that the defendant knew the representation to be false; 3) that it was made with the intent to deceive; 4) that the plaintiff reasonably relied on the representation, and, 5) that a loss was sustained as a result of the reliance. *In re Constantino,* 72 B.R. 231, 235 (Bankr.N.D.Ohio 1987).

In the present case, the key word in § 523(a)(2) appears to be "obtained". BancOhio has not shown, by clear and convincing evidence, that the Imbodys received their loan, or the crop proceeds, as a result of any deceitful or fraudulent actions on their part. The bank has failed to demonstrate that the Imbodys did not intend to repay the loan at the time they entered into the security agreement. Thus, the Debtors subsequent actions, though wrongful, do not support nondischargeability under § 523(a)(2)(A). *In re Maranzino,* 67 B.R. 394, 397 (Bankr.D.Kan.1986).

DISCHARGEABILITY UNDER § 523(a)(2)(B)

Section 523(a)(2)(B) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

■ BancOhio argues that the Imbodys' loan application, and the security agreement which they executed, were entered into by the Debtors–In–Possession without any intention of complying with the representations contained in those documents. Specifically, the bank contends the Imbodys did not intend to repay the loan. However, the bank has failed to present clear and convincing evidence to support its allegation. The Imbodys stated that they made the decision to pay the I.R.S., and not respect the bank's security interest, after their taxes were prepared. *See,* November 7, 1986 *Deposition of James E. Imbody* at 52. Moreover, the Imbodys would not have been able to pay their taxes ahead of the bank's crop lien if the grain payment checks had been issued to both the Debt-

ors–In–Possession and BancOhio. Neither party foresaw Central Soya's decision to issue the grain checks to the Imbodys only. Accordingly, the Court must conclude that BancOhio has failed to prove that the Imbodys did not intend to repay the bank at the time they entered into the security agreement.

## DISCHARGEABILITY UNDER § 523(a)(4)

BancOhio also seeks to have their debt found nondischargeable under § 523(a)(4), which states:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

Under this Section, the phrase "while acting in a fiduciary capacity" modifies the words "fraud or defalcation", and not the terms "embezzlement or larceny", which are actionable regardless of whether or not the debtor was a fiduciary. *See, In re Kelley*, 84 B.R. 225, 231 (Bankr.M.D.Fla. 1988); *In re Salamone*, 78 B.R. 74, 76 (Bankr.E.D.Pa.1987); *In re Shinew*, 33 B.R. 588, 592 (Bankr.N.D.Ohio 1983); *In re Talcott*, 29 B.R. 874, 878 (Bankr.D.Kan. 1983); 3 *Collier On Bankruptcy* 523.14 at 523–96 (15th ed. 1988). In the case *sub judice*, BancOhio argues that the Imbodys' actions establish nondischargeability under either embezzlement, larceny, or both. First, BancOhio asserts that the debt owed to them should be held nondischargeable because the D–I–P's failure to pay over the crop proceeds constituted embezzlement.

For purposes of federal bankruptcy law, the definition of the term "embezzlement" is to be determined under federal common law. *In re Bevilacqua*, 53 B.R. 331, 333 (Bankr.S.D.N.Y.1985); *In re Graziano*, 35 B.R. 589, 594 (Bankr.E.D.N.Y.1983); *In re Storms*, 28 B.R. 761, 765 (Bankr.E.D.N.C. 1983). While there is general agreement as to the broad outline of the definition of embezzlement, there are some interesting problems associated with determining more specific distinctions and applications under a federal common law standard. First, embezzlement was not a common law crime, its origins are statutory. *See, United States v. Bailey*, 734 F.2d 296, 303 (7th Cir.1984), *cert. den.* 469 U.S. 931, 105 S.Ct. 327, 83 L.Ed.2d 263 (1984); 26 Am.Jur.2d *Embezzlement* § 1. However, in recent years, there has been a trend toward the elimination of embezzlement as a separately defined crime. For example, in Ohio it has been replaced by the broader definition of theft set forth in O.R.C. § 2923.02. *In re Shinew*, 33 B.R. at 593; 28 O.Jur.3d *Criminal Law* § 1972.

For Bankruptcy purposes, the most widely accepted definition of "embezzlement" follows the outline set forth in *Collier On Bankruptcy:*

> Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come. It differs from larceny in the fact that the original taking of the property was lawful, or with he [sic] consent of the owner, while in larceny the felonious intent must have existed at the time of the taking.

3 *Collier On Bankruptcy* 523.14[3] at 523–102 (15th ed. 1988).

While the above definition provides a general outline of the elements of embezzlement, there are other elements involving the parties' relationship, and the D–I–P's actions, which may play a part in analyzing embezzlement, but which are not fully delineated in the above definition. More particularly, it has been held that embezzlement cannot occur between strangers. Some courts have stated that there must be a special confidential relationship between the parties, whereby the defendant has been entrusted with possession of the property in question. *See*, 26 Am.Jur.2d *Embezzlement* § 3. More widely accepted is the holding that a mere debtor-creditor relationship, in and of itself, is not sufficient for embezzlement. *See United States v. Mason*, 218 U.S. 517, 31 S.Ct. 28, 54 L.Ed. 1133 (1910); *In re Storms*, 28 B.R. 761, 765 (Bankr.E.D.N.C.1983); *State v. Lewis*, 27 O.L.A. 21 (Ohio Ct.App.1938); 26 Am. Jur.2d *Embezzlement* § 17. However, un-

der the Bankruptcy Code, any requirement of a "confidential relationship", or an "entrustment", if recognized at all, has not been interpreted as stringently as the "fiduciary" requirement for fraud or defalcation. For example, courts have held secured debts to be a sufficient foundation for the finding of nondischargeability on the grounds of embezzlement. *In re Hoffman,* 70 B.R. 155, 162–164 (Bankr.W.D. Ark.1986); *In re Beasley,* 62 B.R. 653, 654–655 (Bankr.W.D.Mo.1986); *In re Freeman,* 30 B.R. 704, 708 (Bankr.W.D.La.1983). *See also, In re Powell,* 54 B.R. 123, 126 (Bankr. D.Or.1983) (failure to deliver payments to buyer of chattel paper held to be embezzlement). It should also be noted that, at all relevant times, the Imbodys were D–I–P's with the rights and duties of trustees. *Cf., In re Alvey,* 56 B.R. 170 (Bankr.W.D.Ky. 1985).

Other courts have viewed the problem differently. When there is no security interest, courts have held that funds which come into a debtor's hands belong to the debtor, and any subsequent use of those funds is not embezzlement. *In re Koelfgen,* 87 B.R. 993, 998 (Bankr.D.Minn.1988); *In re Storms,* 28 B.R. 761, 765 (Bankr.E.D. N.C.1983).

A related exception to the embezzlement definition involves a debtor's right to commingle the funds which are owed. *See, In re Myers,* 52 B.R. 901 (Bankr.E.D.Va.1985); *In re Epperson,* 45 B.R. 708 (Bankr.E.D. Tenn.1985). This exception is also not applicable to the case at bar. The crop proceeds were not part of the D–I–P's "general fund". The input crop lien was perfected by filing, and notice of BancOhio's security interest was given pursuant to O.R.C. § 1309.26(B). The notice instructed the grain purchasers to issue only two-party checks. The Imbodys' testimony reflected that they knew this, and that they were surprised when the checks arrived in their names only. Clearly, the proceeds from the 1985 crops were not to be commingled with the D–I–P's other funds. Moreover, the 1985 security agreement between the parties specifically lists proceeds of the crops, including cash and accounts receivable. *See,* Exhibit 5.

Returning to the federal definition of embezzlement, it appears that the Imbodys' conduct establishes a basis for holding their obligation to the bank nondischargeable under § 523(a)(4). Embezzlement has been held to require two elements which must be proven: (1) that the debtor appropriated funds for his own benefit and (2) that the debtor did so with fraudulent intent or deceit. *Matter of Michel,* 74 B.R. 88, 90 (N.D.Ohio 1986). Circumstantial evidence may be used to establish the elements of embezzlement. *In re Michel,* 74 B.R. 80, 87 (Bankr.N.D.Ohio 1985), *aff'd, In re Michel,* 74 B.R. 88, 90 (N.D.Ohio 1986); *In re Corwin,* 76 B.R. 221, 223 (Bankr.S.D. Fla.1987). Most courts that have considered the issue have held that acting with deceit will satisfy the fraudulent intent requirement. *See, In re Michel,* 74 B.R. at 90; *Savonarola v. Beran,* 79 B.R. 493, 496 (Bankr.N.D.Fla.1987); *In re Bevilacqua,* 53 B.R. 331, 334 (Bankr.S.D.N.Y.1985); *In re Graziano,* 35 B.R. 589, 595 (Bankr.E.D. N.Y.1983).

In the present case, the Imbodys, while acting as D–I–P's in their farm reorganization case, lawfully received crop proceeds from Central Soya. They understood that the proceeds were subject to the bank's security interest, and that the checks were to be issued jointly under the provisions of § 1309.26(B). Nevertheless, the Imbodys converted the proceeds in order to pay their tax obligations. As previously noted, they did not have a good faith belief that they were acting properly under the terms of the security agreement. The Imbodys stated at Trial that they made a deliberate decision to pay the I.R.S. instead of Banc-Ohio. Despite their knowledge of Banc-Ohio's security interest in the proceeds, they used those funds to satisfy what they believed was their tax obligation. During the time that these actions were taking place, the Imbodys acted deceitfully, concealing their receipt of the crop proceeds by ceasing to file monthly reports as required by the Court and the Bankruptcy Code. Based on the above findings of fact, the Court finds that the debt to BancOhio

should be held nondischargeable because it resulted from the D–I–P's embezzlement.

The Court will not hold the debt nondischargeable as larceny, because the original taking was not wrongful.

## DENIAL OF DISCHARGE UNDER § 727(a)(2)

It appears that BancOhio's main objective has been to have its debt held nondischargeable pursuant to the Bankruptcy Code sections which have been previously discussed. While it may not be accurate to describe BancOhio's Objection to Discharge as a "fall back position", it has not seemed to be the bank's primary purpose to prevent the discharge of the remainder of the Imbodys' debts. A review of the Imbodys' Schedules reflects large amounts owed to Federal Land Bank and BancOhio, possibly totaling several hundred thousand dollars even after the sale of the underlying collateral. Under this fact situation, the penalty of denial of the Imbodys' Discharge appears unduly harsh.

However, the Court is disturbed by the fact that the Imbodys have, in effect, improved their position through the misuse of the bankruptcy system. Denial of Discharge is, generally, intended to remedy conduct which is wrongful toward the court, or is wrongful as to all creditors. In this case, the Imbodys acted in bad faith while under the protection of the Bankruptcy Court. Moreover, if the Imbodys' Discharge is allowed, it may be argued that the Debtors "got away with it". Essentially, the Imbodys will have succeeded in evading the extraordinary collection powers of the I.R.S., and substituting the bank's less powerful civil remedies in their place. They will have also avoided the penalties and interest charges associated with the nonpayment of the tax obligations. Consequently, this case is a very close one. Nevertheless, the Court will deny BancOhio's Complaint, and allow the Imbodys' to discharge their other obligations based upon the equitable considerations present in this case.

In reaching these conclusions, the Court has considered all the evidence and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

ORDERED that BancOhio's 1985 secured loan to the Imbodys be, and is hereby, approved *nunc pro tunc*. This approval is granted pursuant to the Court's general equitable powers, and under § 105(a).

It is FURTHER ORDERED that BancOhio's Complaint to Determine Dischargeability of Debt and Objection to Discharge be, and is hereby, Granted in part, and Denied in part.

It is FURTHER ORDERED that BancOhio's crop loan to the Imbodys be, and is hereby, Nondischargeable under § 523(a)(6).

It is FURTHER ORDERED that BancOhio's Complaint be, and is hereby, Denied under § 523(a)(2)(A) and § 523(a)(2)(B).

It is FURTHER ORDERED that BancOhio's crop loan to the Imbodys be, and is hereby, Nondischargeable under § 523(a)(4).

It is FURTHER ORDERED that BancOhio's Objection to Discharge be, and is hereby, Denied.