In re Lawrence A. COYLE, Debtor.

DeMarco Roofing, Inc.,
et al., Plaintiffs,

v.

Lawrence A. Coyle, Defendant.

Bankruptcy No. 12–59338.
Adversary No. 13–02046.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division.

Signed Sept. 30, 2014.

Entered Oct. 1, 2014.

Christine Liebler Liberto, Joseph M. Patchen, Carlile Patchen & Murphy, LLP, Columbus, OH, for Plaintiffs.

David L. Day, Ashville, OH, Erica A. Probst, Kemp, Schaeffer, Rowe & Lardiere Co., Columbus, OH, for Defendant.

## MEMORANDUM OPINION ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF CERTAIN DEBT

C. KATHRYN PRESTON, Bankruptcy Judge.

This cause came on for trial on December 16–20, 2013, on Plaintiffs' Complaint Objecting to Dischargeability of Debt Owed to DeMarco, Inc. and DeMarco Roofing, Inc. (Doc. 1) ("Complaint") and

Defendant's Answer to Complaint (Doc. 7). Present at the trial were Frank DeMatteo ("Mr. DeMatteo"), sole shareholder and corporate representative of DeMarco Roofing, Inc. ("Roofing") and DeMarco, Inc. (collectively, "Plaintiffs" or "DeMarco Companies"), and counsel for Plaintiffs, attorney Joseph M. Patchen. Also present were Defendant Lawrence Coyle ("Defendant" or "Mr. Coyle") and his attorneys, Erica A. Probst and David L. Day.

The Complaint seeks a determination that a certain unliquidated debt, allegedly owed by Mr. Coyle, is non-dischargeable pursuant to § 523(a)(2)(A), (a)(4), and (a)(6) of the Bankruptcy Code. Plaintiffs allege that Mr. Coyle, while president of Roofing, fraudulently misappropriated Plaintiffs' funds in the approximate amount of $280,000.00 [1] (hereinafter, "Alleged Debt"), to finance the operations and projects of other entities in which Mr. Coyle has an equity interest. Defendant, on the other hand, contends that Mr. DeMatteo knew about these other entities and the manner in which Roofing and/or DeMarco, Inc. funds were used, and authorized use of the funds.

At the trial, Plaintiffs conceded that the evidence does not support a cause of action under § 523(a)(6), and therefore, the Court will not address that count of the Complaint. For the reasons stated below, the Court finds that Plaintiffs have failed to establish that any debt owed by Mr. Coyle to Plaintiffs is non-dischargeable under 11 U.S.C. § 523(a)(2)(A) or (a)(4).

## I. Jurisdiction

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and General Order 05–02 entered by the United States District Court for the Southern District of Ohio, referring all bankruptcy matters to this Court. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Venue is properly before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. Findings of Fact

The Court makes the following findings of fact based on the evidence adduced at trial, including the exhibits admitted into evidence [2] and the testimony elicited from the witnesses [3]:

DeMarco, Inc. was established in 1986 by Mr. DeMatteo and his business partner, Mark Grubb. The company's original purpose was to acquire and rehabilitate real estate for resale to investors. Sometime around 1990, Mr. DeMatteo became the sole shareholder of DeMarco, Inc. Currently, the company owns a one-half interest in the building at 1160 South Front Street, Columbus, Ohio, which houses Roofing's office; the other half interest in the building is owned by Mr. DeMatteo, individually.

Roofing was established because DeMarco, Inc. needed roofing work completed during restoration of its real estate acquisitions. Originally, DeMarco, Inc. completed the roofing work on its projects; however, DeMarco, Inc.'s roofing business began to expand beyond its own restora-

---

1. The Complaint alleges that Mr. Coyle fraudulently misappropriated Plaintiffs' funds in an amount in excess of $280,000.00; however, at the trial, Plaintiffs revised their demand to seek a judgment of non-dischargeability of debt in the amount of $250,867.00.

2. At the trial, the parties sought and obtained admission of voluminous exhibits; however,

many of the admitted exhibits were not discussed in testimony. The Court did not consider those exhibits about which no testimony was offered.

3. The Court considered all testimony given and exhibits admitted about which testimony was given (see footnote 1), even if not specifically mentioned in this Opinion.

tion projects, so Mr. DeMatteo spun off the roofing business and created DeMarco Roofing, Inc. Since its inception in the mid–1990s, Mr. DeMatteo has been the sole shareholder of Roofing, and through 2007, Mr. DeMatteo served as Roofing's president, tasked with running the day to day operations of the company.

Roofing had been doing primarily residential roofing, and Mr. DeMatteo wanted to increase Roofing's commercial roofing business. Mr. DeMatteo and Mr. Coyle first met in July 2007, when Mr. Coyle responded to an advertisement by Roofing seeking to fill a commercial sales position. Mr. Coyle had been in the construction business since the 1970s, had worked in commercial and industrial construction in several states, and had management experience. Although Mr. Coyle had applied for the sales position, Mr. DeMatteo was impressed by Mr. Coyle's work experience and knowledge of the construction business. In August 2007, Mr. DeMatteo and Mr. Coyle had a second meeting, at which it was clear that Mr. DeMatteo was considering Mr. Coyle for a management position at Roofing, and that he intended to grow the business. Subsequently, Mr. DeMatteo's secretary telephoned Mr. Coyle to ask how he would like his name spelled on his business card. After hearing nothing further from anyone at Roofing for a few days, Mr. Coyle attempted to contact Mr. DeMatteo regarding the status of his employment. He was unsuccessful despite multiple tries, so Mr. Coyle pursued other business opportunities.

In late August 2007, Mr. Coyle interviewed with, and was hired by, Property Care One, Inc. of Ohio ("Property Care of Ohio"). Property Care of Ohio was owned by John Horton ("Mr. Horton"). Mr. Horton also owned the entities Property Care One, Inc. of Florida ("Property Care One of Florida") and Property Care Florida,

LLC ("Property Care Florida"). Property Care of Ohio and Property Care One of Florida conducted roofing projects in Ohio and Florida, respectively. Property Care Florida was essentially the "bank" for the other entities; it was the entity through which the expenses incurred by Property Care of Ohio and Property Care One of Florida were paid.

In September 2007, Mr. Horton explained to Mr. Coyle that his companies were in financial distress. Despite the immediate cash flow issue, Mr. Coyle believed that Mr. Horton's Florida companies were viable, and that there was potential for growth in the Florida roofing industry. So in mid-September 2007, Mr. Coyle acquired Property Care One of Florida and Property Care Florida. Mr. Coyle declined to acquire Property Care of Ohio, but agreed to help wind up its projects in Ohio.

In January 2008, Mr. DeMatteo finally contacted Mr. Coyle to offer him the position of president of Roofing. Mr. Coyle explained to Mr. DeMatteo that his situation had changed: That he was wrapping up roofing projects with Property Care of Ohio, and that he had acquired entities which performed roofing projects in Florida. Mr. DeMatteo agreed that Mr. Coyle could run the other businesses, so long as it did not interfere with the business of Roofing. Mr. Coyle was hired by Roofing as president. His duties included employee hiring and firing, bidding prospective jobs, troubleshooting, coordinating progress on projects, and overseeing invoicing on projects and payment of bills. However, it seemed to Mr. Coyle that Mr. DeMatteo never fully relinquished the role of president, as Mr. Coyle was not solely responsible for company operations. Despite having the responsibility to oversee receivables and payables, Mr. Coyle was not responsible for overseeing the general

ledger and did not work in the QuickBooks program, the accounting software utilized by Roofing. Initially, Mr. Coyle was not authorized to write or sign checks, and could initiate only certain funds transfers from the bank accounts. Mr. DeMatteo also retained power to approve and disapprove Mr. Coyle's decisions and activities. But despite the restrictions on Mr. Coyle's authority as president, Mr. DeMatteo did not clearly outline the limitations or his expectations in writing or otherwise. Evidently, running Roofing was the joint effort of Mr. Coyle and Mr. DeMatteo.

Early in his tenure as president of Roofing, Mr. Coyle hired Ken Fetting ("Mr. Fetting") to assist in the day to day operations of Roofing. One of Mr. Fetting's many job duties was to aid Jennifer Plogher ("Ms. Plogher") with Roofing's bookkeeping and general accounting. Ms. Plogher had been hired by Mr. DeMatteo in October 2007, and served as Roofing's general secretary and bookkeeper. She also had authority to use a stamp of Mr. DeMatteo's signature to stamp checks to pay the bills and expenses of Roofing. Mr. Fetting and Ms. Plogher were the only Roofing employees who knew how to use QuickBooks.

Shortly after Mr. Fetting joined Roofing's staff, Mr. Fetting, Mr. Coyle, and Mr. DeMatteo started meeting, generally on a weekly basis, to discuss the financial position of Roofing. At these weekly meetings, Mr. Fetting, Mr. Coyle, and Mr. DeMatteo would assess the amount of cash on hand and the amount of cash coming in from projects, compared to the immediate financial obligations of Roofing. If Roofing was unable to meet its obligations in a particular week, Mr. Coyle would pay certain obligations with an American Express[4] ("AMEX") card[5]. Mr. DeMatteo authorized Mr. Coyle to cover any of Roofing's shortfalls with the AMEX card.

In February or March of 2008, Mr. Coyle and Mr. DeMatteo decided to pursue a "storm chasing" opportunity in Atlanta, Georgia (the "Georgia Project"). Tornados had recently ripped through parts of Atlanta, creating a surplus of roofing work. In order to obtain a contractor's license in Georgia, Mr. DeMatteo and Mr. Coyle together, purchased 51% of Property Care Roofing and Repair of Georgia ("Property Care Georgia") for approximately $50,000.00—each contributing approximately $25,000.00. An individual by the name of Jeff Hanson ("Mr. Hanson") was hired to be the project manager in Georgia. However, within a month or so, issues started to arise with Mr. Hanson and his staff. Mr. Fetting and Mr. DeMatteo's son, Jason DeMatteo, were sent to Georgia to address the issues and monitor the work. For their work performed on the Georgia Project, Mr. Fetting and Jason DeMatteo were paid by Roofing.

To obtain roofing materials and supplies for the Georgia Project, Property Care Georgia utilized Roofing's supply account at Bradco Supply ("Bradco"). The Bradco invoices relating to the Georgia Project were paid using Mr. Coyle's AMEX card. Payments on the AMEX account, and all other expenses related to the Georgia Project, were paid through Property Care Florida. Revenue from the Georgia Project was transferred from the Property Care Georgia checking account to a Property Care Florida bank account in order to

4. The American Express account was Mr. Coyle's father's account; however, testimony indicated that Mr. Coyle was an authorized user of the account.

5. Mr. Coyle also used the AMEX card to cover certain expenses of Property Care One of Florida and Property Care Georgia (as hereinafter defined).

pay the expenses [6].

In the early spring of 2008, due to the cyclical nature of the roofing business, Roofing was having cash flow problems. A Roofing accounts payable aging report indicates that, as of May 1, 2008, Roofing had accounts payable of $207,101.91 in the aggregate. Of those, $47,868.98 were greater than 90 days past due; $13,726.75 were 61–90 days past due; $46,711.86 were 31–60 days past due; $20,046.78 were 1–30 days past due; and $78,747.54 were current. This obviously means that bills due as far back as January 2008 (or earlier), before Mr. Coyle joined Roofing, were not being paid timely.

To help Roofing meet its cash flow needs until it collected on jobs, Mr. Coyle continued to pay certain obligations of Roofing with his AMEX card. Also during this time period, Mr. DeMatteo took out a loan in the approximate amount of $160,000.00 to aid Roofing in meeting its ongoing obligations. In early May 2008, so Roofing could meet its weekly payroll, Mr. Coyle caused Property Care Florida to loan Roofing $20,000.00. The money was transferred out of Property Care Florida's Bank of America checking account, and into Roofing's checking account at Ohio Valley Bank ("OVB"). Roofing did not execute a note evidencing the obligation; however, the transaction was entered as a loan payable in Roofing's Quick-Books.

In June 2008, Mr. Coyle and Mr. DeMatteo discussed building a larger general construction company under the "DeMarco" brand. To further the concept, they planned to spotlight a Property Care One of Florida project in Florida (the "Florida Project") in literature promoting the new DeMarco brand. As a result, Roofing hired Harold Little ("Mr. Little") as its vice president of construction, and immediately sent him to Florida to manage the Florida Project. Although he was an employee of Roofing, and running a Property Care One of Florida project, Mr. Little was paid with funds from one of DeMarco, Inc.'s checking accounts. After completion of the Florida Project, Mr. Little returned to Roofing's Columbus office to manage Roofing projects around central Ohio.

At the time Mr. Coyle was hired as president, Roofing and DeMarco, Inc. each maintained only one bank account, both at OVB. Around the time Mr. DeMatteo and Mr. Coyle started to promulgate the new DeMarco brand, Mr. Coyle suggested that Mr. DeMatteo open a DeMarco, Inc. checking account at National City Bank in order to facilitate payment of Roofing's employees at the Florida Project and the Georgia Project. Mr. DeMatteo obliged, and on July 11, 2008, he opened a National City account for DeMarco, Inc. On August 1, 2008, Mr. Coyle opened a Bank of America account on behalf of DeMarco, Inc. For this account, Mr. Coyle signed the signature card, noting that he served as president of DeMarco, Inc. Mr. DeMatteo was not listed on account documents as a signatory on the account [7].

---

**6.** According to Mr. Coyle, AMEX would only allow a maximum of 2 to 3 payments per month on the account, and therefore, it was necessary to pay all of the charges on the AMEX account through one entity.

**7.** DeMarco, Inc. held two checking accounts at National City Bank, accounts ending in # 6066 and # 5881, and two checking accounts at Bank of America, accounts ending in # 4743 and # 4769. However, at all times relevant to this proceeding, DeMarco, Inc.'s National City account ending in # 5581, and Bank of America account ending in # 4769, remained virtually inactive. Therefore, any reference to DeMarco, Inc.'s National City account refers to the account ending in # 6066, and any reference to DeMarco, Inc.'s Bank of America refers to the account ending in # 4743.

After the financial crisis in 2008, Roofing was experiencing a delay in the availability of funds for checks deposited at OVB: OVB would not release the funds until checks cleared the drawee/payor bank and OVB actually received the funds. In an effort speed up the rate at which such funds became available, Mr. Coyle opened bank accounts at the banks of two of Roofing's major customers. In December 2008, Mr. Coyle opened Roofing accounts at Fifth Third Bank and Key Bank. Both accounts were opened with Mr. DeMatteo's knowledge and consent.

On September 9, 2008, Mr. Coyle caused the incorporation of DeMarco Enterprise, Inc. ("Enterprise") in the state of Delaware[8]. On Enterprise's Consent of Incorporator, the initial directors were listed as Mr. Coyle, Mr. DeMatteo, and Mr. Fetting. Enterprise never issued any stock. On November 25, 2008, Mr. Coyle opened a Chase bank account on behalf of Enterprise. The business address listed on the account is Mr. Coyle's home address, and therefore, the bank statements were mailed to Mr. Coyle's home.

In the summer of 2009, Mr. Fetting discovered what he thought was an irregularity in Roofing's QuickBooks records regarding the reporting of certain loans by and between Roofing and Enterprise or Property Care Florida. Mr. Fetting took his findings to Mr. DeMatteo. Mr. DeMatteo directed him to talk to Tom Miller, the company's accountant. Mr. Miller had prepared and filed tax returns for many years for Mr. DeMatteo, individually, and Mr. DeMatteo's various entities, including

Roofing and DeMarco, Inc. Mr. Miller confirmed Mr. Fetting's suspicions—the QuickBooks records indicated that Roofing transferred more funds to Enterprise and Property Care Florida than Roofing received from those entities.

On August 3, 2009, Mr. Fetting, Mr. Coyle, and Mr. DeMatteo met to review a packet detailing the financials of Roofing, which Mr. Coyle had assembled (the "August 3rd Meeting"). The packet contained Roofing's projected budget, loan statements for the various bank loans Roofing was paying, and multiple promissory notes between Roofing and other entities for obligations that Mr. Coyle believed Roofing owed, or obligations that were owed to Roofing. The packet also included copies of invoices[9] from Property Care Florida and Enterprise to Roofing for amounts owed by Roofing. One particular invoice relates to the Georgia Project: It shows a total loss of $168,399.12, and allocates 50% of that loss to "DeMarco."

In late August 2009, Mr. Coyle had an altercation with Jason DeMatteo, and as a result, Mr. Coyle demanded that Jason be fired for insubordination. Mr. DeMatteo refused to fire his son, and, on August 27, 2009, Mr. Coyle submitted his letter of resignation. He never returned to Roofing's office.

## III. The Expert's Report

From May 2008 through Mr. Coyle's departure from Roofing, there were numerous transfers of funds by and between Plaintiffs and the various other entities. Additionally, expenses incurred by one en-

---

8. The incorporator of Enterprise was Delaware Corporations LLC, a fee based service which provides assistance with the formation of entities under Delaware law. Mr. Coyle submitted an online request to Delaware Corporations LLC for the incorporation of Enterprise.

9. It is unclear as to whether the packet presented by Mr. Coyle at the August 3rd Meeting actually contained the invoices at the time of the meeting, or if the invoices were presented to Mr. Fetting and Mr. DeMatteo shortly after the meeting.

tity were frequently paid by another entity. At the time of the transactions, no invoices were generated to bill the beneficiary entity, nor were any notes or loan documents executed.

After Mr. Coyle's departure from Roofing, Plaintiffs hired a forensic accounting expert, Ms. Chrissie Powers ("Ms. Powers"), to review the financial transactions among the various companies. Ms. Powers did not consider the Florida Project and the Georgia Project to be Roofing or DeMarco, Inc. projects, and any expenses associated with those projects were not treated as expenses of Roofing or DeMarco, Inc. Further, as Mr. DeMatteo contends that he did not authorize the opening of DeMarco, Inc.'s Bank of America account, transfers to or from that account were not treated as transfers of DeMarco, Inc.; instead such transfers were considered transfers to or from the Coyle Entities (as defined below).

According to the expert, from April 2008 through August 2009 [10], funds from Plaintiffs' various bank accounts [11], totaling $1,136,916.00, were either transferred directly to Property Care Florida, Property Care Georgia, Property Care One of Florida and Enterprise (collectively, the "Coyle Entities"), or utilized to pay the expenses of the Coyle Entities. Further, payments from Roofing's customers, totaling $72,284.81, were deposited into Enterprise's Chase account, a payment of $2,057.19 by a Roofing customer directly to Bradco was applied to Bradco invoices re-

lating to projects of the Coyle Entities, Mr. DeMatteo allegedly loaned Mr. Coyle $10,000.00, and Plaintiffs incurred $8,395.00 in expenses as a result of the misappropriations. Thus, Ms. Powers concluded that approximately $1,229,653.00 of Plaintiffs' funds were misappropriated to the Coyle Entities. There were no transfers to Mr. Coyle personally, other than payment of Mr. Coyle's compensation.

The report also reflected that, during the same time frame, the Coyle Entities transferred funds totaling $499,851.00 to Roofing's OVB account, expenses of Plaintiffs totaling $446,381.00 were paid using Mr. Coyle's AMEX card, and expenses of $14,159.00 were paid by Mr. Coyle personally, using other means. Therefore, the Coyle Entities and Mr. Coyle, personally, paid $960,391.00 to, or for the benefit of, Plaintiffs. Ms. Powers had determined that the net misappropriations of Plaintiffs' funds to the Coyle Entities was $269,262.00. At the trial, Plaintiffs alleged that net misappropriations totaled $250,867.00, conceding that the loan from Mr. DeMatteo to Mr. Coyle, and the expenses incurred as a result of the misappropriations, were misclassified and should not have been included in Ms. Powers' calculation [12].

## IV. Analysis and Discussion

 Because the overarching purpose of the Bankruptcy Code is to provide a fresh start to those in need of relief from

---

10. The expert's report indicates that it covers the time period of April 2008 through April 2010. However, according to the spreadsheets generated by Ms. Powers and attached as exhibits to her report, no relevant transfers or transactions occurred after August 2009.

11. These accounts include Roofing's OVB account, Roofing's Fifth Third account, Roofing's Key Bank account, DeMarco, Inc.'s OVB account, and DeMarco, Inc.'s National City account.

12. There was additionally a $5,000.00 check from Enterprise to Mr. DeMatteo, personally, which may be an appropriate credit to the Coyle Entities. However, inasmuch as the Court is not granting judgment in favor of Plaintiffs, the Court need not decide that issue.

the efforts of creditors [13], exceptions to discharge are to be strictly construed against the complaining party. *Rembert v. AT & T Universal Card Serv., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir.1998). Notwithstanding, the relief provided by the Bankruptcy Code is intended only for the "honest but unfortunate" debtor and not to protect perpetrators of fraud or those who engage in egregious conduct. *Grogan*, 498 U.S. at 287, 111 S.Ct. 654.

A. *Plaintiffs Have Not Demonstrated False Pretenses, False Representations, or Actual Fraud Under Section 523(a)(2)(A).*

Plaintiffs' first cause of action seeks to except the Alleged Debt from discharge pursuant to 11 U.S.C. § 523(a)(2)(A). That section provides, in pertinent part:

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud....

11 U.S.C. § 523(a)(2)(A).

■ In order to compel a court to except a debt from discharge under § 523(a)(2)(A), the court must first find that the defendant "obtained" money. "[I]t is not necessary that the [money] actually be gained for the direct benefit of the debtor. Even an indirect benefit to the debtor may constitute 'obtaining property' within the meaning of section 523(a)(2)(A)." 4 *Collier on Bankruptcy* ¶ 523.08[1][a] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2010).

■ In the instant case, the alleged misappropriations of the funds of DeMarco,

Inc. and Roofing were transferred to, or paid on behalf of, one of the Coyle Entities, not Mr. Coyle personally. But, inasmuch as Mr. Coyle was a major shareholder and/or controlled each of the Coyle Entities, he "obtained" money for purposes of § 523(a)(2)(A). *See Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172 (6th Cir.1996) (holding that a debtor who controlled and was the president of the corporate recipient of a creditor's diverted funds obtained money for purposes of § 523(a)(2)(A)). Having found that Mr. Coyle "obtained" money for purposes of § 523(a)(2)(A), the Court must determine whether such money was obtained by false pretenses, false representations, or actual fraud.

■ "In order to except a debt from discharge [for a false representation] under § 523(a)(2)(A), a creditor must prove the following elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss." *Rembert*, 141 F.3d at 280–81 (footnote omitted).

■ False pretenses are distinguishable from false representations in that "[a] false pretense involves an implied misrepresentation or conduct that is intended to create and foster a false impression while a false representation involves an express representation." *Goldberg Securities, Inc. v. Scarlata (In re Scarlata)*, 127 B.R. 1004, 1009 (N.D.Ill.1991). *See also Blascak v. Sprague (In re Sprague)*, 205 B.R. 851, 859 (Bankr.N.D.Ohio 1997); *Wings & Rings, Inc. v. Hoover (In re Hoover)*, 232 B.R. 695, 700 (Bankr.S.D.Ohio 1999).

**13.** *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

For purposes of § 523(a)(2)(A), actual fraud is defined broadly—"any deceit, artifice, trick or design involving a direct and active operation of the mind, used to circumvent and cheat another— something said, done or omitted with the design of perpetrating a cheat or deception." 4 *Collier on Bankruptcy* ¶ 523.08[1][e] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2010). *See also McClellan v. Cantrell*, 217 F.3d 890, 899 (7th Cir.2000) ("[B]y distinguishing between 'a false representation' and 'actual fraud,' the statute makes clear that actual fraud is broader than misrepresentation.") (citing 4 *Collier on Bankruptcy* ¶ 523.08[1][e] (Lawrence P. King, ed., 15th ed. 2000)). "Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *McClellan*, 217 F.3d at 899 (citations omitted). Actual fraud has also been defined as "deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed." *Sprague*, 205 B.R. at 859. In order to prevail under § 523(a)(2)(A), Plaintiffs must illustrate that the existence of an actual or positive fraud; fraud implied by law is not sufficient. *Rembert*, 141 F.3d at 281.

Plaintiffs have failed present any evidence showing that Mr. Coyle obtained any money through misrepresentations, either express or implied, upon which Plaintiffs relied. The only misrepresentation Mr. Coyle made was when he informed Bank of America that he was the president of DeMarco, Inc. in order to open a checking account. Nothing in evidence indicates that Mr. DeMatteo or any of Roofing's employees knew about the statement, let alone relied on it. Further, as Mr. DeMatteo and any Roofing and DeMarco, Inc. employees would certainly understand such a statement to be false, any reliance on the statement would not be justifiable. Thus, Plaintiffs cannot prevail under the first clause of § 523(a)(2)(A).

This leaves for consideration whether Mr. Coyle's actions fall within the parameters of false pretenses or actual fraud. As discussed below, the preponderance of the evidence does not support Plaintiffs' contention that Mr. Coyle undertook any actions with intent to defraud or deceive Mr. DeMatteo and/or Plaintiffs. As intent to defraud or deceive is a necessary element in proving false pretenses, false representation, or actual fraud, the Court cannot determine the Alleged Debt to be non-dischargeable under any provision of § 523(a)(2)(A).

Plaintiffs contend that Mr. Coyle developed a plan to utilize the assets of Roofing for the benefit of his own entities. Plaintiffs argue that, in executing this alleged plan, Mr. Coyle first gained the trust of Mr. DeMatteo and was appointed president of Roofing. Then, under the guise of president, and in an effort to sow confusion regarding Plaintiffs' finances, Mr. Coyle opened various bank accounts on behalf of Plaintiffs, and caused Plaintiffs to transfer funds to and from the various accounts. In an effort to legitimize the transfers and justify the use of Plaintiffs' assets for projects other than those of Roofing, Plaintiffs contend that Mr. Coyle led employees of Roofing to believe that Mr. Coyle and certain Coyle Entities were conducting joint projects with Plaintiffs and/or Mr. DeMatteo, when, in fact, they were not. Additionally, Plaintiffs argue that, even

though Plaintiffs also received incoming funds from Property Care Florida and Enterprise, such transfers were actually in advancement of Mr. Coyle's plan. Plaintiffs also contend that in furtherance of the plan, Mr. Coyle concealed certain financial information of Roofing and DeMarco, Inc., and the existence of Enterprise from Mr. DeMatteo. Lastly, Plaintiffs claim that Mr. Coyle's attempt to document previous transactions for the August 3rd Meeting was an effort to bring legitimacy to his fraudulent misappropriation of Plaintiffs' assets, and, in and of itself, is evidence of the existence of such a plan.

While the Court concedes the existence of such a plan would be indicia of intent to deceive, based on the evidence presented at trial, Plaintiffs' theory must fail. First, the Court rejects Plaintiffs' contention that Mr. DeMatteo, Roofing, and/or DeMarco, Inc. did not have an interest in the Georgia Project. Mr. DeMatteo insists that the money he contributed towards the purchase of the interest in Property Care Georgia was a loan to Mr. Coyle. Conversely, Mr. Coyle contends that he and Mr. DeMatteo purchased Property Care Georgia as partners or joint venturers. The Court finds Mr. Coyle's testimony credible. In support of their position, Plaintiffs portrayed Mr. DeMatteo as a well versed businessman that would never enter into such a partnership or joint venture without a written agreement. However, the Court notes that Mr. DeMatteo handled several business matters in a manner atypical of a sophisticated businessman: He did not require a written lease agreement for Roofing's lease of office space. Office rent paid by Roofing was based on Roofing's cash flow rather than a market rate. He disregarded corporate formalities by causing Roofing to loan money to, or pay expenses of, his other business entities without formal documentation. Further, if the transaction in question was in fact a loan, a sophisticated businessman would have required Mr. Coyle to execute a note or other documentation to evidence the loan, but Mr. DeMatteo did not do so. Accordingly, the Court cannot rely on Mr. DeMatteo's business acumen as persuasive evidence that the Georgia Project was not a joint venture.

In addition, Mr. DeMatteo knew that Mr. Fetting and Jason DeMatteo, both Roofing employees, were paid by Roofing while working on the Georgia Project. He contends that his son and Mr. Fetting were "loaned" to Property Care Georgia, and that Roofing was to be reimbursed for their salaries. Mr. DeMatteo, however, did nothing to procure reimbursement: He did not cause Roofing to invoice Property Care Georgia for the salary expense, demand payment, or even ask when reimbursement would be forthcoming.

Last, Mr. Fetting, who the Court found very credible, testified that Mr. DeMatteo inquired about the status of the Georgia Project, and whether "we" (meaning the joint venture) were making any money on the project. At another time, Mr. DeMatteo stated to Mr. Fetting, "You know I have money in this." Additionally, Mr. DeMatteo occasionally met with Mr. Fetting along with Mr. Coyle and Mr. Hansen to discuss the Georgia Project and what to do. Mr. DeMatteo was strongly interested in Roofing expanding its operations, and was not averse to working on projects out of state or jointly with others. Prior to Mr. Coyle's tenure, Roofing, at the direction of Mr. DeMatteo, conducted projects in Texas with a contractor named Steve Hilliard ("Mr. Hilliard"). Additionally, Mr. DeMatteo later licensed the "DeMarco" name to Mr. Hilliard to pursue a storm chasing opportunity in central Ohio: For a percentage based fee, Mr. Hilliard was permitted to perform projects under

the name DeMarco Roofing Siding & Gutters.

All of the circumstances indicate that Mr. DeMatteo had a greater interest in the Georgia Project than just that of creditor of Mr. Coyle. Because it appears that Mr. DeMatteo and Mr. Coyle were actually involved in joint projects, either individually or through their respective entities, Mr. Coyle cannot be charged with deceit for leading employees of Roofing to believe such.

Nor does the Court find the bank account activity to be nefarious. It appears that DeMarco, Inc.'s National City and Bank of America checking accounts were opened for a legitimate business purpose. As previously stated, Mr. Coyle and Mr. DeMatteo had discussed building a larger general construction company under the DeMarco brand. With expansion into Florida and Georgia, it became necessary to open those accounts because employees on the Florida and Georgia Projects, which were to fall under the new DeMarco brand label, had difficulty cashing payroll checks at banks other than the drawee/payor bank: In one instance, prior to opening the accounts, Mr. Coyle had to FedEx cashier's checks to employees in Georgia. Opening accounts at National City Bank, which had branches in Ohio and Florida, and Bank of America, which had branches in Florida and Georgia, provided employees local access to the bank upon which their payroll check was drawn. Mr. DeMatteo nonetheless denies that DeMarco, Inc. was expanding its operations to affiliate with the Georgia Project or Florida Project. However, DeMarco, Inc.'s National City account *was opened by Mr. DeMatteo*, upon the request of Mr. Coyle, and Mr. DeMatteo knew why the account was opened. As Mr. Coyle was not an officer of, or otherwise previously involved with DeMarco, Inc., it seems unlikely that Mr. DeMatteo would open an additional checking account at the request of Mr. Coyle, unless there was an intention to expand the operations of DeMarco, Inc.

The Court notes that Mr. Coyle opened DeMarco, Inc.'s Bank of America account without authority from Mr. DeMatteo, and did so by falsely representing to Bank of America that he was the president of DeMarco, Inc. Nonetheless, because it appears that Mr. Coyle had a legitimate business purpose for opening the account, the Court will not infer intent to defraud or deceive in opening the account. Further, the account statements for the DeMarco, Inc. Bank of America account were mailed to Roofing's Columbus office, so it does not appear that Mr. Coyle intended to conceal the existence of this account, or the transactions involving this account, from Mr. DeMatteo.

Roofing's Fifth Third checking account and Key Bank checking account were opened with Mr. DeMatteo's consent, and also for a legitimate business purpose—so that Roofing had almost immediate access to its revenue stream from certain large projects. Mr. DeMatteo testified that Mr. Coyle had limited authority with regards to the Fifth Third and Key Bank accounts: That Mr. Coyle was only authorized to transfer funds from said accounts to Roofing's OVB account. However, there is no evidence of any such written restriction on Mr. Coyle's authority, and Mr. Coyle was not aware of any such restriction.

Moreover, the Court cannot conclude that the transfer of funds from Property Care Florida and Enterprise to Roofing and DeMarco, Inc. was in furtherance of the alleged plan to fraudulently utilize the assets of Roofing. Plaintiffs point to the first transfer from Property Care Florida to Roofing, which occurred in May 2008, when Mr. Coyle caused Property Care Florida to loan Roofing $20,000.00. Plain-

tiffs contend that the purpose of this loan was to cause Roofing's QuickBooks to show a loan payable to Property Care Florida. Plaintiffs' expert testified that any payments from Roofing to Property Care Florida would then appear less suspicious, as Roofing's QuickBooks records would indicate that Roofing and Property Care Florida had a lender/borrower relationship. However, Mr. Coyle testified that the loan was made so that Roofing could meet that week's payroll. The May 2008 accounts payable aging schedule indicates that Roofing was severely behind on its obligations and desperately needed cash. Under these circumstances, the Court cannot find that Mr. Coyle had any ill will or intent to deceive in causing Property Care Florida to make the loan. It appears that Mr. Coyle was simply doing what he could to ensure Roofing's employees were timely paid and keep the company operating smoothly.

Similarly, the evidence does not support Plaintiffs' contention that Mr. Coyle concealed any financial information, or the existence of Enterprise, from Mr. DeMatteo. In fact, the evidence suggests the contrary. Mr. Fetting, Mr. Coyle, and Mr. DeMatteo had weekly meetings to discuss the financial position and cash flow needs of Roofing. They also discussed development of a larger construction business. To further that strategy, during at least one of the weekly meetings, Mr. Coyle showed a graphic depicting Enterprise as an "umbrella" entity for Roofing and De-Marco, Inc. The concept was that any ventures pursued would fall under the Enterprise umbrella. Also, on July 10, 2009, Mr. Coyle wrote a check to Mr. DeMatteo, personally, out of the Enterprise Chase bank account. The check clearly indicated Enterprise as the account holder; yet Mr. DeMatteo indorsed and deposited the check without any questions regarding the name or entity. Mr. Coyle never request-ed that Mr. Fetting misreport information in Roofing's QuickBooks records, and Mr. Fetting never denied Mr. DeMatteo access to the QuickBooks records. Mr. Fetting further testified that, at one weekly meeting, Mr. DeMatteo inquired as to why money was being moved from entity to entity. Such an inquiry indicates that Mr. DeMatteo was informed of Enterprise and the financial ongoings of Plaintiffs; however, even if Mr. DeMatteo did not have such actual knowledge, given the totality of the circumstances, the Court cannot conclude that Mr. Coyle purposefully concealed such information from Mr. DeMatteo.

Finally, the Court cannot find that Mr. Coyle's effort to document certain transactions prior to the August 3rd Meeting is evidence of a plan to defraud or deceive. Mr. Coyle put together such documents after inconsistencies were discovered in the QuickBooks records of Roofing; he intended the documents to be an accounting and settlement of accounts among the entities. This process was logical under the circumstances: Once Mr. Coyle discovered there were inconsistencies in the QuickBooks records, he documented the transactions in question as best he could, and then attempted to reach an understanding with Mr. DeMatteo regarding the financial relationships of all the companies.

The Court should note that it did not appear that Mr. DeMatteo's testimony was disingenuous. It appears that he honestly believes that he did not agree to a corporate strategy of aggressive growth built on joint ventures and construction projects outside of central Ohio, or to Mr. Coyle embarking on a course of conduct toward establishing a corporate structure with a new entity known as DeMarco Enterprises. It may be that Mr. Coyle acted precipitously or under a mistaken impression, but that doesn't equate to a fraudulent intent. The Court is persuaded and finds

that Mr. Coyle acted on the belief that Mr. DeMatteo was supportive of Mr. Coyle's concept and actions toward growing the roofing and construction business, as Mr. DeMatteo had articulated to him during their early meetings. Accordingly, the Court concludes Plaintiffs failed to demonstrate by a preponderance of the evidence that Mr. Coyle had intent to defraud Plaintiffs. Thus, there is no basis for the Alleged Debt to be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

B. *Plaintiffs Have Not Demonstrated Fraud or Defalcation While Acting in a Fiduciary Capacity, Embezzlement, or Larceny Under Section 523(a)(4).*

Plaintiffs' second cause of action seeks to except the Alleged Debt from discharge pursuant to 11 U.S.C. § 523(a)(4). That section provides, in pertinent part:

(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny ....

11 U.S.C. § 523(a)(4).

The phrase "while acting in a fiduciary capacity" applies only to the words "fraud or defalcation"; embezzlement and larceny are separate grounds for non-dischargeability under § 523(a)(4), and do not hinge on whether a fiduciary relationship existed. *Nat'l City Bank v. Imbody (In re Imbody)*, 104 B.R. 830, 840 (Bankr.N.D.Ohio 1989). Therefore, a plaintiff can prevail under § 523(a)(4) by establishing that the defendant committed either (1) fraud or defalcation while acting in a fiduciary capacity, or (2) embezzlement, or (3) larceny.

1. *Plaintiffs Have Not Established That A Fiduciary Relationship Existed.*

The "fiduciary capacity" component has been interpreted by the Sixth Circuit Court of Appeals to apply only to those situations involving an express or technical trust. Establishing the existence of such a trust requires the creditor to show "(1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary." *Ohio Carpenter's Pension Fund v. Bucci (In re Bucci)*, 493 F.3d 635, 639–40 (6th Cir.2007) (quoting *Commonwealth Land Title Co. v. Blaszak (In re Blaszak)*, 397 F.3d 386, 391–92 (6th Cir. 2005)).

The provision also applies to trusts established by statute, so long as the trust exists prior to, and does not arise out of, an act of wrongdoing. *Bucci*, 493 F.3d at 640. Although state law is important in determining when a fiduciary relationship exists, the question of whether one falls within the definition of fiduciary relationship for purposes of § 523(a)(4) is governed by federal law. *Blaszak*, 397 F.3d at 390. The Sixth Circuit Court of Appeals has held that a fiduciary relationship, such as an agent-principal relationship or an attorney-client relationship, standing alone, is insufficient to establish the type of fiduciary capacity contemplated by § 523(a)(4). *R.E. America, Inc. v. Garver (In re Garver)*, 116 F.3d 176, 179 (6th Cir.1997). Under Sixth Circuit jurisprudence, the debtor must hold funds in trust for the benefit of a third party in order to satisfy the fiduciary relationship element of the defalcation provision of § 523(a)(4). *Id.*

In the instant case, Plaintiffs failed to present any evidence to support a finding that an express or technical trust was established. Plaintiffs only allege that Mr. Coyle, as president of Roofing, stood in a fiduciary relationship with Roofing.

While it is true that, under Ohio law, a corporate officer owes fiduciary duties to his or her employer [14], such imposition of duties is insufficient to create a fiduciary relationship for purposes of § 523(a)(4). *See Peoples Bank & Trust Co. of Hazard v. Penick (In re Penick),* 149 F.3d 1184, 1998 WL 344039, at \*5 (6th Cir.1998)(unreported) (stating, "[t]he mere recognition that an insolvent corporation or one of its directors owes a fiduciary obligation to the corporation's creditors does not create an actual trust fund, as is required by § 523(a)(4)."). Plaintiffs' cause of action seeking to except the Alleged Debt from discharge for fraud or defalcation while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4) must fail.

### 2. *Plaintiffs Have Not Demonstrated Embezzlement or Larceny Under Section 523(a)(4).*

For the purposes of § 523(a)(4), embezzlement is the " 'fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.' " *Brady v. McAllister (In re Brady),* 101 F.3d 1165, 1172–73 (6th Cir.1996) (citing *Gribble v. Carlton (In re Carlton),* 26 B.R. 202, 205 (Bankr.M.D.Tenn.1982)). "A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud." *Brady,* 101 F.3d at 1173 (citing *Ball v. McDowell (In re McDowell),* 162 B.R. 136, 140 (Bankr.N.D.Ohio 1993)). The fraud element may also be satisfied by a showing of deceit. *See Imbody,* 104 B.R. at 841 (stating that "[m]ost courts that

have considered the issue have held that acting with deceit will satisfy the fraudulent intent requirement" of embezzlement); *H.P. Marketing Corp. v. Mills (In re Mills),* 210 B.R. 289, 292 (Bankr.N.D.Ohio 1996) (stating that the third element of embezzlement is the use of "some form of fraud or deceit"). While embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, it differs from larceny in that the original taking or possession of the property is lawful, or with the consent of the owner. Larceny requires a finding that felonious intent existed at the time of the taking. *Moore v. U.S.,* 160 U.S. 268, 16 S.Ct. 294, 40 L.Ed. 422 (1895)

As with Plaintiffs' cause of action under § 523(a)(2)(A), Plaintiffs' cause of action to except the Alleged Debt from discharge for embezzlement or larceny under § 523(a)(4) must fail. As discussed in section "A" above, the Court cannot find that a preponderance of the evidence supports a finding that Mr. Coyle acted with fraudulent intent or intent to deceive. While the Court notes that Mr. Coyle may have improperly conducted certain transactions with Plaintiffs, the Court cannot conclude that Mr. Coyle possessed the requisite intent to except the Alleged Debt from discharge.

### C. *The Findings and Conclusions Contained in Ms. Powers' Expert Report Are Flawed.*

The Court notes that, based on the evidence presented at trial, the calculations and conclusions contained in Ms. Powers' expert report are flawed. In computing the amount of the alleged misappropria-

---

**14.** *See DeBoer Structures (U.S.A.) Inc. v. Shaffer Tent And Awning Co.,* 233 F.Supp.2d 934, 953 (S.D.Ohio 2002) (stating, "[i]t is well-established that a corporate officer occupies a fiduciary relationship to his or her employer and that this relationship imposes upon the officer a number of duties, including 'good faith, a duty of loyalty, a duty to refrain from self-dealing and a duty of disclosure.' ") (citation omitted).

tions, Ms. Powers assumed that there were no joint ventures between Mr. Coyle and Mr. DeMatteo and/or Plaintiffs, and consequently deemed all Plaintiffs' transfers to, or for the benefit of, the Coyle Entities, as unauthorized misappropriations of Plaintiffs' funds. However, because Mr. DeMatteo and Mr. Coyle were involved in joint ventures, the various transfers by Plaintiffs to the Coyle Entities cannot be considered patently unauthorized.

Likewise, transfers to and from DeMarco, Inc.'s Bank of America account may have been misapplied in Ms. Powers' report. Because Mr. DeMatteo did not authorize the opening of DeMarco, Inc.'s Bank of America account, any transfers to and from that account were deemed transfers of the Coyle Entities. But, as previously discussed, Mr. Coyle opened the account for a legitimate business purpose. So, while the act of opening the account was not authorized, transfers to and from the account may have been legitimate, authorized transactions of DeMarco, Inc.

Moreover, the Court is not confident that the report reflects a complete review of the financial transactions of all the entities involved. Ms. Powers conceded that she did not review all checks written out of Enterprise's Chase account, and it is unclear whether she reviewed any checks issued from Plaintiffs' non-OVB accounts, or properly credited Mr. Coyle for transfers into those accounts. Thus, there could have been payments made to, or for the benefit of, Plaintiffs, which were not properly recognized and accounted for when Ms. Powers drew her conclusions.

Last, the Court would be remiss if it did not point out possible bias in the information Ms. Powers used to compile her ex-

pert report. Ms. Powers testified that the only person she discussed the transactions at issue with was Mr. DeMatteo; she did not interview Mr. Coyle, Mr. Fetting, or Ms. Plogher during her investigation. Although it appears that they may have declined to be interviewed, there was no indication that they were deposed on topics relevant to Ms. Powers' report, or that Ms. Powers reviewed information obtained from them in any other fashion prior to preparing her report. Accordingly, the Court must view Ms. Powers' report with skepticism.

## V. Conclusion

For the foregoing reasons, Plaintiffs have failed to demonstrate that they are entitled to judgment under 11 U.S.C. § 523(a)(2) or (a)(4). A separate final judgment will be entered in accordance with this opinion.

**IT IS SO ORDERED.**